Good morning, and may it please the Court, Jean-Claude André on behalf of the United States, and I will do my best to save three minutes for rebuttal. There's no dispute in this case that there was a conspiracy between at least Evans, the broker of the deal, Mullins, the ringleader of the robbery crew, and Hurth, the muscle of the crew. There's no dispute that there was a conspiracy between at least them to rob a cocaine stash house. There also can be no reasonable dispute that Defendants Nelson and Harris, the two defendants at issue in this appeal, entered into a conspiracy to do something nefarious with guns. The only question now before this Court is whether the something nefarious with guns that Nelson and Harris conspired to do was the same home invasion robbery of a stash house that the others irrefutably conspired to commit. So the real question is, is there enough evidence from which a jury could reasonably infer beyond a reasonable doubt that Nelson and Harris knew what the job was that the others were undertaking? Yes, Judge Fletcher, and the evidence certainly was sufficient. The district court in this case and the defendants here on appeal have been likening this case to a mere presence case. They seem to want a formal agreement, a formal memorialization of Nelson and Harris' understanding And of course, since Abusi, the 1982 case that we consider to be this Court's lead conspiracy case, that's just not required. Conspiracies are clandestine in nature, and the jury is free to infer its existence and participants' knowledge of it and its object from various pieces of circumstantial evidence. Here, though, we were relying on much more than circumstantial evidence. We actually have quite a bit of direct evidence of their knowledge, or at least enough that could allow any rational juror to conclude. What is the direct evidence? Because I had the impression in reviewing this that you really had a circumstantial case, which the law says you can have for a conspiracy. Right. I mean, I guess it depends on, you know, what you consider to be direct and what's so direct about your direct evidence. Direct evidence is evidence when one co-conspirator says, oh, my other co-conspirators, they know. And that happened repeatedly here. Evans was saying repeatedly that Nelson and Harris knew the plan. And, of course, Evans knew the details inside and out. Mullins said repeatedly that Nelson and Harris knew the plan. And, of course, Mullins knew the details inside and out. And, in fact, he even – I've got an evidentiary question here, and that is, if it is in dispute as to what Harris and Nelson knew as to what the conspiracy was about, is the evidence of the co-conspirators as to what the conspiracy was about admissible under the co-conspirator theory? That is to say, because what's in – exactly what is in dispute is the extent of the conspiracy, and you're allowing the co-conspirators to testify based on the assumption that the conspiracy is that broad, or the charged conspiracy is the conspiracy. Do you see the logical problem I'm having? I do, and I think the answer is that there – this wasn't a question of testimony about – or testimony from the co-conspirators. We're not dealing with a hearsay exception under Rule 802. The statements from Mullins and Evans and Hurth about Nelson and Harris's knowledge was recorded and comes in freely that way. It's just a question of, you know, how much does the jury credit it? And given that that evidence is there, and in our view, it's direct because it speaks to the precise issue. And why does it come in freely when it's recorded rather than if it were testimony? Pardon me? Why does it come in freely because it's recorded rather than if it were testimony at trial? I guess it would all come in as – It would come in either way, wouldn't it? As party admissions of the speakers who were – who were defendants on trial. It would come in – But admissions against themselves. That's not admissions against themselves. That's evidence against a co-defendant. No, that's correct. Did it come in without objection? The recordings, yes, came in without objection. That may be the answer. And there were some objections about, you know, the particular transcripts from one of the co-defendants who's not at issue in this appeal. But the recording and the transcripts themselves came in freely. As I was saying before, there were – so there were all these statements from the actual participants in the – or from the irrefutable participants and irrefutably knowing participants as to Nelson and Harris' knowledge. But we, of course, also have the evidence that they did show up with guns at the appointed time and at the appointed location. They showed up with dark clothing and they showed up with gloves. So they had the necessary tools of the trade. And the evidence in this case establishes that they were going to be the exclusive firepower to carry out this robbery. So all these things, when put together, would reasonably allow a juror to conclude that they had knowledge. Yes. Everything you say makes sense to me. What doesn't. What I'm struggling with is we've got an experienced, sensible child judge who heard all the evidence, who is not – he was a prosecutor for a long time who says he didn't have enough evidence. What's going on here? I understand Judge Fletcher. You know, Judge Feese is one of our favorite jurists because he's careful, hardworking, and he used to be one of us. But, you know, this is a human exercise. And even the best judges, like, you know, best prosecutors will make mistakes. And I think in this case, Judge Feese didn't properly apply the Neville's framework. And so, actually, if you look at his written order, on the one hand, you say, wow, he rolled up his sleeves. He tried really hard. Most judges don't give this kind of lengthy written ruling on a Rule 29 motion. But at the same time, when you look at it, you realize that what he was doing was a lot of weighing, a lot of making of credibility determinations, drawing a lot of inferences, doing all the various things that the jury is uniquely charged or exclusively charged with doing, and that the reviewing court under Rule 29 motion is precluded from doing. Now, perhaps if Judge Feese had actually made some observations relevant to what he saw in the courtroom, then we might be having a slightly different discussion. Frankly, I don't know what we would do with that if he said, you know, I saw the agent testify, and every time he said something that pointed the finger at the defendants, he, you know, put his head down and he looked unconfident. I don't know if this Court could consider that. But Judge Feese didn't do that. What he did is look at, or at least the way this Court has to treat it, is as if he was looking at the same record that this Court is looking at, as if he was looking at just transcripts. As a legal matter, I don't think, as much as Your Honor may want to, I don't think you can give him even any atmospheric deference. And then, of course, because of the various mistakes he made in his order, I don't think in this case he would be entitled to it anyways. As we pointed out, a number of Judge Feese's factual statements are just wrong, again, you know, erroneous. In particular, the one with respect to whether Nelson and Harris, right before they were going to hop up into the vehicle that was going to take them directly to the stash agent Whitmore's last-ditch effort to explain the details of the plan. He was talking to Hurth, the muscle. And Judge Feese found that there was no way they could have overheard that. But as Exhibit 6A, which we reproduced intentionally in our brief on page 41, shows, coupled with Agent Whitmore's testimony, they absolutely were in earshot because Agent Whitmore was facing in a certain direction, so that way he could see that Nelson and Harris were paying attention while at the same time talking to Hurth. And there's just a number of those mistakes. And, yes, Judge Feese is a great judge. He's one of our favorites. He tries really hard, and you can see that in his order, but, you know, he made some mistakes there. And all in all … Did he also make a mistake when he commented on the direction that Mullins was seen walking at 104th and Barring Cross? I think he was mistaken with respect to what car Mullins arrived in. He also was mistaken with respect to who arrived first. I mean, absolutely yes. When Agent Whitmore showed up, Mullins was already there and then walked down or walked west past Agent Whitmore, which is the same direction from where Nelson and Harris came. And, of course, that was yet another opportunity from between 515 and 630 when the arrest took place where Nelson and Harris could have obtained the requisite knowledge. And so when Judge Feese says, oh, no, they couldn't have obtained the knowledge at that point in time, that was wrong. And even if he had been correct, it would just be one more opportunity where they could not have obtained the knowledge. But, you know, 515 to 630, an hour and 15 minutes is a lot of time when the conversation only needs to be as detailed as, ready to hit his stash house? Yes. Well, there had to be some reason they showed up with gloves on. And one for sure had a gun, the other one at least probably did, yeah. Right. They didn't show up by accident. Right, right, absolutely. And, you know, again, if you, we, we. And they weren't gathering at the warehouse to discuss whether or what flowers to plant that day. No, not at all, not at all. I mean, we have concert of action. Again, we have the direct evidence in the form of the statements. And then we also have acts in furtherance by Nelson Harris, bringing the guns and the gloves and the dark clothing. And, you know, that sets this case apart from, for example, Estrada Macias, where we had no acts in furtherance. There was no reason to think that they were involved in a conspiracy to rob a stash house, other than, as you say, the others in this conspiracy kept telling the agent, oh yes, they know all about it. And were very anxious to have the agent not talk to them himself. And they kept reassuring the agent, you don't, don't talk to them. They know everything. Now, maybe it's up to a jury to decide what seemed to have been apparent to Judge Fease, that that didn't show that they really knew it. If anything, it may have shown that they didn't know it, because they didn't want the agent to talk to them. That's again a jury call. As I said, it may be a jury call, or it may have been so that they didn't want these people to find out what they knew. They didn't want the agent to find out what they knew. And if we're looking for a reason, the Judge Fease may have been so sure that there wasn't enough evidence. And the first thing you mentioned, and you mentioned conviction, is that they assured the agent that he did know and kept the agent from asking about it. I think that, again, it's our position that that's a question for the jury to resolve. That's why we have trials, and that's why this case went to trial, because our evidence wasn't stronger. We didn't have a more conclusive recorded statement or a fully integrated written contract memorializing the conspiracy. But, and this is grounded in the evidence. The problem with that hypothesis, that somehow Mullins, Evans, and Hearth were keeping Nelson, and Harris, and Facey in the dark is that at 630, Hearth said, we're ready to hop up into that car and go to the stash house. And the evidence was that the occupants of the stash house were going to be armed. And Nelson and Harris were the firepower to deal with that. It would be a bizarre situation for the necessary firepower to not know what they're doing when there's potentially going to be a gun battle. They need to know what their role is, and they need to know what they're getting into. Otherwise, they're going to be themselves potentially ineffective and put the ringleaders at risk. And we believe that the jury could have concluded that. But no, they must have known by that point in time, in addition to all the reasons already explained, because they had to be useful participants by the time they were ready to hop up into the car at 630 and go to the stash house. Unless the court has further questions for me now, I will save the rest of my time for rebuttal. May it please the court. I'm Stephen Fry. I represent Mr. Harris on appeal. And I would like to consume approximately ten minutes of our allotted time. And Mr. Greenberg then will take the last five minutes. He is Mr. Nelson's counsel. Your honors, this is a case that, or the kind of a case that the court in Nevels alluded to. This is that rare case in which a rational, properly instructed jury could not find guilt beyond a reasonable doubt, given the evidence at trial. And Judge Feist, he sat through the entire trial, through the pre-trial motions, which were somewhat extensive. And he observed all the witnesses, saw the defendants in the courtroom. And he concluded that the government had not proven a case beyond a reasonable doubt, and no rational jury could find that. In fairness, we'll stipulate that the trial judge is an excellent trial judge. But that really doesn't provide us with a legal standard to review here, just as we can't rely on the fact that the jury found both defendants guilty. I mean, really, that's a wash. And we have to look at what the trial judge said and his reasons for granting the motion. Agreed. Agreed. Yes, the standard is certainly de novo. But as the court's well aware, Judge Feist is an extremely fair judge and gave us an extremely fair trial. And a de novo review means we must resolve conflicting inferences in favor of the government and assume that the jury did so as well, correct? That's correct, your honor. Those are tough hurdles. Absolutely. That's why this is the rare case in which a properly instructed rational jury could not have found guilt beyond a reasonable doubt, given the evidence in the case. Let me state the evidence that seems to me clear from which then the inference is going to be drawn. Your client, Mr. Harris, and Mr. Nelson were there. They have some form of gardening gloves on. Your client is seen throwing a gun, which appears to be the gun that's later recovered. Another gun is recovered. Nelson was not seen throwing it, but perhaps there's a legitimate inference that that was his gun that was found. They show up at the time and place when the other conspirators are unquestionably preparing to go rob the Stash House. So we know that they're in on something. The only inference that's needed from that is they knew the enterprise that the others were engaged in. Is that right? That's absolutely correct, your honor. And that's, and we've got the Boy, that's not much of an inference. Well, it is and it isn't. As the Court was directing its questions to the Assistant U.S. Attorney, that the, Mr. Mullins and Mr. Evans and Mr. Hurth, all were very anxious or very protective of the information that they had. If the Court recalls at the car wash, Mr. Mullins made sure that Mr. Facey wasn't in the presence when he discussed the matter with Agent Whitmore, and he had Mr. Nelson and Mr. Harris were not even in the area, or they were in the area, but they were not there. On the ride down from the 104th and Bering Cross location, which is where Mr., or Agent Whitmore first encountered Mr. Harris and Mr. Nelson, they didn't ride with Mr. Evans and Agent Whitmore. They rode with Mr. Facey, who had been kept away from Agent Whitmore at the car wash. And during that conversation, Mr. Evans says, the big homies, that would be, you know, Mullins and Hurth, those are the ones you talk to. Okay, so he's trying to keep Agent Whitlock away from Mr. Nelson and Mr. Harris. And then when we get to the scene, Mr. Hurth, after Agent Whitmore starts to talk to him, immediately interrupts him, said, you don't have to tell the story, you know. He seems to be actively preventing Mr. Whitmore, who specifically stated, in response to Mr. Greenberg's questions, that he wasn't sure that these people were on board. He, and he told Mr. Evans that on the way down to the arrest location, that I need to talk to these people. I'm not sure, you know, this is dangerous stuff. I want to make sure everybody's on the same page. So the people that did know about it actively kept our clients from finding out. And I think Judge Feist... Now, finding out what? Would it be sufficient to support the conviction if Harris and Nelson knew that they were going to commit a home invasion robbery without knowing the detail of the home, without knowing specifically what it is that they're going to steal? No, Your Honor. I believe that under the Garcia case, that the government, if they charge a specific conspiracy to rob a stash house that contains cocaine, then they have to prove that. They can't just prove a generic robbery. Do they have to prove cocaine? Well, certainly in order to meet the burden on count one, they had to, absolutely, because that was the drug conspiracy count. But that was the object of the robbery, was the cocaine. So they also would have to prove it on count two, which was the Hobbs Act robbery. That was the object of the conspiracy, to prove the cocaine. You know, this is not in Judge Feist's order. It occurs to me, at least as a possibility, that the reason why the details might be kept from Nelson and Harris is that because it's cocaine, there's a fair amount of money at stake and maybe they didn't want to cut Harris and Nelson in for very much money. I mean, that's an inference that could be drawn. And Judge Feist did draw that inference because he put it in his order that that was their incentive. They certainly had an incentive to do that. They had several incentives. One was to, if they told them, these young men, what the actual purpose of the robbery was, that they may not go along with it. They may say, hey, I'm not going to go in with a bunch of dope dealers and try to steal their stuff. I could get killed. Or they may want more of the proceeds, as Your Honor mentioned. Well, if they want more, they're certainly going to find that out when they arrive there and see what they're getting. So that doesn't really follow. That's something they're going to find out. Well, eventually they certainly will, yes. But again, at the time, I think they were 19, 18, maybe 19, 20-year-old kids. They're that. They're kids. I mean, when I was 19, I didn't consider myself a kid, but I do now at my age. And Mr. Hurth and Mr. Mullins are considerably older. They're grown men. Mr. Mullins appears to be in his 40s. And Mr. Hurth, who's a very large and intimidating individual, appears to be someone in his late 30s. So Agent Whitmore himself conceded that when you get involved in these sorts of activities, then nobody trusts each other, that there's a lot of dishonesty involved. So the government would seem to want to suggest that however dishonest Mr. Mullins and Mr. Hurth and Mr. Evans may have been, that when they were dealing with Mr. Ramos and Mr. Harris, they were completely honest. Told them everything. Let them in on the details. And again, this was something that surprised Agent Whitmore. When he went to 104th and Bear and Cross, he thought Snake and Dee were going to be there. So they were already in on the details because he had met with them personally on previous occasions. In fact, there was a judge who granted a motion in limine to keep all their conversations that happened prior to March 10th out of evidence. And so when Agent Whitmore encountered our clients, he didn't know what they knew. He admitted he didn't know what they knew. He had some ambiguous conversation about, are you in on the story? He didn't say what the story was. And then he tells Mr. Evans on the way down, I need to look. I need to let these guys know more about what's going on. And in response to Mr. Greenberg's questions, he conceded that yes, he was talking about Mr. Nelson and Mr. Harris. So on behalf of Mr. Harris, we submit that Judge Feist properly concluded, and again, I understand it's a de novo standard, but we submit that he properly concluded that though he instructed the jury properly, that no rational jury could have found our clients guilty beyond a reasonable doubt. Thank you. Good morning, Your Honors. And may it please the Court. My name is Stan Greenberg. I represent Mr. Nelson. I'd like to make four points, most of which go to the issues raised by Judge Fletcher and Judge Reinhart. First of all, the government counsel has said that the evidence was full, the record was full of evidence that the co-defendants told Nelson and Harris what the plan was. But he didn't cite anywhere, and you can look in the brief and you can look in the record, that's not true. Not only is it not true, but it's contradicted by the record because Mullins specifically told the undercover agent, we need you, we want you to run this plan down for whoever we bring in here, the new guys. And second of all... Say that one more time. Yes. In the last call that Mullins had with the agent when they were planning to meet, Mullins told the agent, we'll get together and you can run this down with them, and the agent explained that that meant he interpreted as Mullins wanted him, the undercover agent, to explain the plan to the newcomers. No, I got that part. But you said, and then you also said that there's no testimony from the co-conspirators that Harris and Nelson knew what was going to happen? Maybe I misheard you. There was no such evidence, and keep in mind when I say no such evidence, there was that one ambiguous conversation where the agent said, you know the story, and an unidentified male responded yes, and Mullins said something like they're cool or they know what's going on, something like that. There was something to that effect, but keep in mind... So there's no tape-recorded testimony that's introduced into evidence in which... The only tape-recorded testimony, Your Honor, they had a lot of tape failures. The only tape-recorded testimony is a very brief, ambiguous conversation that the undercover agent had with Nelson and Harris when they arrived. They said, you guys cool, yeah, I'm fly D. If you don't want to do this, let me know. You guys know the story, and an unidentified male said yes. And the reason that becomes significant... It was either Nelson or Harris who said yes, according to Whitmore. It was either Nelson or Harris who said yes, according to Agent Whitmore. According to his testimony, that is precisely correct, Your Honor. The transcript said unidentified male. The reason that becomes important and the reason Judge Feist found insufficient evidence, these are specific intent crimes. It's not enough to show they were up to no good, which I'll concede for the sake of argument. These circumstances out there are highly suspicious. But they're specific intent crimes to interfere with commerce through a robbery and to possess and distribute cocaine in an amount of more than five grams. Your Honor, Judge Fletcher, you raised the question of the reasons why some of the co-defendants may not have wanted to brief Nelson and Harris on the plan. And those reasons are outlined by Judge Feist in his order. And one of them is the one that you raised. They may not want them to know what's involved, because then the main guys could keep more of the proceeds for themselves. But aren't we engaging as jurors when we do this? I'm sorry, I didn't hear. Are we not engaging as jurors when we speculate about reasons why or why not? Isn't the jury allowed to connect the dots, so to speak, once they're laid out there and either find that the government has proven beyond a reasonable doubt or not? Yes, subject to the limitations of Jackson v. Virginia in Rule 29, Your Honor. The difference is what the government calls inference, we call speculation. And the reason the evidence contradicts and undermines the government's position is this. Whitmore testified that when Nelson and Harris showed up, he was shocked. That was his word. He was shocked to see them. He didn't know who they were. He didn't know what they knew. And he made a point, he said, of going over to talking to them to make sure they understood and knew what was going on. And then he had that ambiguous conversation, and he conceded that when he finished, he still wasn't convinced. Knew that they knew what was going on, and he said, I was hoping they were on board. That was his word. And that's why he said he planned to have another conversation with them at the scene of the arrest, but they never had that conversation. So there is no direct evidence of it. The circumstantial evidence is the suspicious circumstances that they were there. And the final point I wanted to make really had to do with this, is this. We cited several cases to the court where people were not only present, but in a room where drug-related activity was going on, and in a vehicle where drug-related activity was going on. But you still need evidence with respect to knowledge and intent to prove the specific intent which are alleged in the crimes here. And that's where it was lacking. Well, the difference between the cases you cited and this case is, in those cases, those other folks were, one might argue, spectators. Your folks were not spectators. They were involved. But the real issue is, how much of involvement did they know, what was shared with them? Isn't that the real issue here? I'm not sure I agree with that, Your Honor. You've chosen to say in the other cases they were spectators. But I think you reached, and I respectfully suggest you reached your conclusion they were spectators because there was insufficient evidence to prove they were participants. That's the point. They were present. Now, if they're... Your folks were participants. They were at the place. They were wearing the gloves. They were having conversations. But what I think you're arguing is, we don't know what specifically they knew. This is a specific intent crime. Not enough. That is precisely correct. I concede, as I did to the jury, I'm not going to say this isn't highly suspicious, but we don't convict people on strong suspicions. You've got to have proof beyond a reasonable doubt. It's the government's burden to prove it beyond a reasonable doubt. And that's what's lacking here. And that's what Judge Feist found. And he explored it and discussed it verbally and in writing in great detail. There were multiple defendants here with differing levels of participation, different levels of culpability. And I think Judge Feist got it exactly right. He sustained the convictions as to the others where there was evidence. But he just found it lacking as to these two. And you can ask the government all you want. And he cannot cite you any evidence putting in these guys' minds or any statements by them that they knew these specific intent crimes that they're accused of having participated in. And what's the answer to the question? They had to know what exactly? I'm sorry, I didn't hear that. I said they had to know what exactly. They had to know that this was a raid on a stash house for cocaine? Well, that would be in the jury instruction, the elements. Count 1 is a conspiracy to possess and distribute cocaine, not just any drug, but cocaine and in a particular amount, not just any amount, but over 5 grams. Count 2 was a Hobbs Act conspiracy to interfere with commerce through a robbery. So they'd have to know it was not just a burglary, but it was a robbery and what the nature of it was. And as to Count 1, they had to know the specific drug and the quantity and what the objective was. All right. Thank you. Thank you. Any questions? Welcome to California. So your opponents challenge you to produce a citation that shows direct evidence that these two guys knew what was going down, even though there's no question they were ready to hop in the car and go. They didn't know where they were going. These citations, Your Honor, are littered throughout our brief. I actually realized that by embedding my citations in my sentences, I probably made some of those sentences a little cumbersome to read, but they're all right there in the statements that we were- Put my nose in the tape recording statement, tape recorded statements to which you referred earlier, in which the co-conspirators or a co-conspirator says Harris and Nelson knew what was happening. Yeah. Pardon me? I mean, I didn't catch the beginning of your question. Well, during your earlier argument, you referred to taped conversations. Yes. In which one or more co-conspirators say Harris and Nelson knew what was going to happen. Yes. So the audio recording from Whitmore's device. Where is that on the record? I want to read it. Your Honor, they all, it's, there are a number of recorded transcripts. Yeah, but I want the ones that you're relying on. The ones, they are, what predominantly we're relying on, government's exhibits 12, 14, 16, and 18. Give me the E.R. pages. Yes. G.E.R. pages 389, 394. Okay, hang on, hang on. Oh, sorry. 389. So what am I supposed to see here on page 389? I'll actually have to flip through it with you, Your Honor, because I didn't, did not tab the individual ones. Let me see here. I guess actually if we were to, G.E.R. 416 is the hop up into the car statement. Okay, where I'm on page 416, what am I supposed to read? Okay, so roughly in the middle, D.W., and that's Darren Whitmore, is telling Herth, and again, as we explained with our use of government's exhibit 6A, Nelson and Harris are within earshot, and Whitmore can see as much. And Whitmore's telling Herth, hey, dude, didn't tell you, you know, all you need to do is come down there and handle your business. You know what I'm saying? The thing is, I got shit coming from Mexico. It's coming from Mexico, which our expert testified at trial, and of course it's somewhat common sense, that's G.E.R. 564, that shit coming from Mexico refers to cocaine, and Herth cuts him off and says, we're getting young homies to hop up in there. Then there's the double dash, hop up in there. Wait a minute, wait a minute. Okay, so we got shit coming in from Mexico. Brother, you'd done already told us the deal. We're just down here to get the point the way. What's the, okay, then Herth says, we're getting young homies to hop in there, hop up in there, and you're contending. Not that Herth is saying that they know. You're contending that Nelson and Harris are overhearing this. Correct, because this was one of the scenarios, one of the scenarios. Okay, is there any place where any of the co-conspirators are saying that Nelson and Harris know what's about to happen? Yes, if we go back a couple pages to government's exhibit page 407, for example. That's where Whitmore says, you have to make sure you're all about the business, man. Harris says, all the time. Whitmore says, I'm flighty, man. If you all don't want to do this, let me know, man. Harris says, all right. Whitmore, you cool. Evans, they good, they good. Harris, yeah, it's all right. Whitmore, you know the story. And then one or the other says, yeah. Right, and our point there is that. Is that enough? I think so, yes. Evans irrefutably knew the details of the plan because Whitmore spoke to him 15 times over a month before the date of the arrest. And so when Evans says, they good, they good, that's direct evidence that Evans believes they know the plan or that he somehow communicated the plan to them. He's telling Whitmore, you don't have to go over with them again. They know. Okay, I had read that before. So that's what you're referring to when you say the co-conspirators are telling us or telling them, which we're now reading, to let us know that Harris and Nelson are in on all the details. Yes, and that's one of the particularly pertinent ones, Your Honor, because Nelson and Harris are right there. They're not saying, wait, we don't know. They could have spoken up. No, I had read that before. I thought you might have more. Okay, I got it. Okay, thank you. I think we're over time. Thank you, Your Honor. The case is argued will be submitted. Thank you all very much.
judges: Zouhary, Reinhardt, Fletcher